Good morning. Fred Simpson on behalf of the appellant Johnson, Rodenburg & Lauinger. We're here because there were a number of rulings made by the court both prior to and during the trial that resulted in an unfair trial from my client. As the court is aware, my client is a law firm from North Dakota. It is in the practice of debt collection. The result reached at trial was a grossly disproportionate verdict awarding compensatory damages to the plaintiff, Timothy McCullough, which didn't have any bearing or connection to the actual damages that he sustained. And in light of the evidence that went in at trial, the verdict can only be seen as punitive rather than compensatory in nature. That's true, Your Honor. The award first that I'll take issue with is the award of $250,000, which was intended apparently to compensate Mr. McCullough for the emotional distress that he suffered due to the fact that my client had filed a lawsuit against him to collect on a credit card debt. Assuming liability for the moment, I understand you're not conceding liability. Assuming liability, though, why is it unreasonable for a jury confronted with this man with a brain injury who's been sued before, got a prior dismissal? He writes this, I think I can call it almost a pathetic note, saying, let me live out with my pain in peace. Why is a jury unreasonable in finding that there has been emotional distress, number one? And if they can find emotional distress, I mean, that's hard to quantify. Why is it unreasonable for them to attach that number? I believe it's unreasonable because in the first instance... Now, first off, is it unreasonable to find emotional distress? We'll concede that Mr. McCullough satisfied the applicable standard for a finding of emotional distress. Okay. We'll concede that. So it's the number we're now talking about. It's the number we're talking about. In preparing for the argument, I looked at the number a number of ways. The number of $250,000 represents emotional distress that Mr. McCullough allegedly sustained during a finite time period. My client filed and served the lawsuit in April of 2007. Mr. McCullough's counsel admitted at trial, on the record, to the district court, that he believed his client's distress ended when Mr. McCullough hired counsel, Mr. Heenan, who represented him in that case. We have a finite period of seven months, April through October. During that time frame, the jury effectively awarded Mr. McCullough approximately $35,000 per month in emotional distress. I think that's unreasonable in light of the proof both from Mr. McCullough and his hired expert, Dr. Viraldi. Dr. Viraldi examined Mr. McCullough one time approximately seven months after the underlying debt collection lawsuit was dismissed. She based her findings upon that approximately one hour interview and a number of written exams that she gave to Mr. McCullough. She testified at trial that she would expect Mr. McCullough, as well as any other person who was suffering from financial stress, to experience some aggravation of their daily stress. Does it make any difference, and I can't quite judge the degree to which this is so on the facts, but does it make any difference that Mr. McCullough is in some respect brain damaged? No, I don't believe it does because while we take the plaintiff as we find him, the jury's award still has to be based on the proof that came in at trial. I think the important thing was from Mr. McCullough's testimony, we can take it that he said that he was angry and upset when he was served with the lawsuit. He said that it aggravated his pre-existing condition where he's had a migraine effectively every day for the prior 17 years. He said he could count on his calendar only four days during that entire 17-year time frame where he'd not had a migraine. So he says he had to lay down and he has a migraine for a few days after this. He says that he received no medical treatment because of his alleged emotional distress. Dr. Voraldi testified that, in fact, she had diagnosed him with a number of conditions, including mixed personality disorder and schizotypal features, but that all of her diagnoses for Mr. McCullough pre-existed the filing of the lawsuit by my client. But emotional distress is not the same thing as having various illnesses. Emotional distress is not an illness, it's emotional distress. So yes, he's had these illnesses, but he says, I was distressed. He says he was distressed, but it was very temporary and in light of his prior history, it doesn't appear that the emotional distress was anything other than what he routinely suffered during the prior 17-year period from the time that he says he had his brain injury in 1990 until the time my client served him with the suit in 2007. Well, given the jury instruction, why is that legal error? I mean, the jury instruction given on emotional distress is pretty broad, and it says specifically, the law does not set a definite standard by which to calculate compensation for mental and emotional suffering distress. It includes mental anguish, nervous shock, highly unpleasant mental reactions, fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry, and nausea. I mean, it's a very broad instruction. So how is that? I understand your jury instruction on that. You don't think that it qualified. But on appeal, given the jury verdict and the instruction, where's the legal error? I think this gets back to the admission of evidence that we believe was highly prejudicial and inflamed the jury. The evidence consisted of the fact that in approximately an 18-month period before the trial of this case, that my client had sued some 2,700 other people in the state of Montana. And the clear inference made by opposing counsel during the closing argument was that my client must have done something wrong in the bulk of those other cases, and therefore you should punish Johnson, Rodenberg, and Lallinger for its conduct, not just with respect to Mr. McCullough, but with respect to those 2,700 other people who aren't here and who haven't brought suits against them. That evidence was inflammatory, and it wasn't relevant. Well, of course it was relevant to punitive damages. Was it a bifurcated trial? It was a bifurcated trial. So the punitive damages comes in after the liability verdict? Under the Montana statute that addresses punitive damages, liability for punitive damages is determined during the opening phase of the trial, but the amount of the award of punitive damages is only determined after the jury decides whether punitive damages are appropriate. But then the testimony as to whether or not they deserve to be punished was properly brought in during the case in chief. There it is. But under Philip Morris v. Williams and State Farm v. Campbell, evidence of their conduct with respect to other persons who are not parties to this suit only goes to show the reprehensibility of the conduct in issue. That, we believe, should only come in during the later half or the bifurcated second half of the trial to determine the amount of punitive damages. It shouldn't come in during the opening phase of the trial when the jury decides whether punitive damages are appropriate in the first place. I don't think you quite answered my question, though, because in answer to Judge Fletcher's question, you said the evidence didn't justify emotional distress. I read you the instruction and said, where's the legal error? And your answer was, other evidence came in. But if you segregate just the emotional distress damages, what's your best argument that the evidence wasn't sufficient, given the jury instruction, to satisfy? The evidence wasn't sufficient and that under the standards for remittiture, the district court should have, on our motion, post-trial motion, ordered remittiture of that award because it was not based on... Let me put it this way. What's your best case that says the things that you described don't justify a verdict of $250,000? Because you're talking... In one portion of your argument, and I don't want to be picky about it, one portion of your argument is saying these type of symptoms don't equate to damages of $250,000. And then we have the broad jury instruction, and we have to look at that in isolation because your other issues are separate. What's wrong with the jury verdict, given the instruction? It doesn't bear any reasonable relation to the actual damage that Mr. McCullough proved that he had sustained. The damage was something temporary and fleeting. Mr. McCullough didn't prove a single dollar of special damages. If we can take the analogy of a ratio of punitive damages based on compensatory damages, and we'll say under State Farm v. Campbell or other U.S. Supreme Court precedent that discuss a ratio, we'll say a single ratio multiplier. And I think that kind of analysis is appropriate in looking at compensatory damages as well. Let's look at figuring out the amount of general damages should be based, in some respects, on what kind of special damages did the person sustain. I understand your theory, but what's your best case? I don't have one as we sit here. And in Montana, and of course it's based on Montana law as well as federal law, Montana has been pretty generous on emotional distress damages. What did you say? Each case stands or falls on its own factual. One of the other errors that we take issue with, or one of the other rulings we take issue with, was the district court's decision denying my client's motion for summary judgment and then motion for judgment as a matter of law on the claims for malicious prosecution and abuse process. We believe that the plaintiff failed to come forward with sufficient evidence to show that my client lacked probable cause to commence the debt collection lawsuit against Mr. McClellan in the first place. But your client would be liable for malicious prosecution if, once having filed, subsequently obtains information that makes it clear the suit shouldn't proceed and then persists with the suit thereafter. Isn't that right? I disagree with that statement in this context because under Montana law, as under I believe most jurisdictions, the statute of limitations, which was the infirmity, is an affirmative defense to be raised by the defendant. And if it's not raised, it's waived. I don't believe that filing a suit beyond the statute of limitations means that the client lacked probable cause or the firm lacked probable cause in the first place. But my question is different, and this is just a straightforward question of law, as to what constitutes malicious prosecution. Let's assume for purposes of argument that at the time of filing the suit it was an appropriate lawsuit. It then comes to the attention of the plaintiff that this is not an appropriate lawsuit. The plaintiff nonetheless persists. Does persisting in that lawsuit, despite having no reasonable basis for the lawsuit, constitute malicious prosecution? I think in a very general sense it could. I don't believe that under the facts of this case. But as a question of law, that could be. And you're just saying on the facts here it's not? Correct. It ties in with then the second element we believe was missing from the malicious prosecution was that my client was somehow activated or proceeded against Mr. McCullough with some malicious intent. There was no proof of any malice at the time my client filed the suit or at the time that it continued with the lawsuit. In fact, the only proof on the record was that my client proceeded with this lawsuit to collect a credit card debt that Mr. McCullough had admittedly incurred. That was the only motive for pursuing this case in the first place. But malicious prosecution doesn't mean malice in the sense that ordinary people use the word in ordinary talk. It means pursuing a lawsuit with no basis for the lawsuit. Well, actually the definition or which definition of malice we should use isn't entirely clear from either the statute or the decisional case law of my client. I agree with you. I think that under either standard the plaintiff didn't come forward with sufficient proof to meet that criteria. The other claim that the court allowed to proceed and that the jury decided on was the abusive process claim. Under Montana law to prove an abusive process, the plaintiff has to show that in the underlying case the party proceeding with the suit was attempting to coerce the plaintiff or the defendant rather to do something that could not otherwise ordinarily be pursued through legal process and that there was some ulterior motive to the suit. In this case, again, there was no proof of any ulterior motive by my client. The undisputed proof both before and at trial was that the motive of my client was to collect the Chase Manhattan credit card debt. In fact, I think it's particularly telling on this point that under cross-examination the plaintiff's own expert, Mr. Andy Patton, admitted that he wasn't aware of any ulterior motive other than the debt and any interest my client had in collecting attorney's fees associated with that lawsuit. We also take issue with the district court's determination that by serving requests for admission on Mr. McCullough during the underlying debt collection lawsuit, my client violated section 1692 E and F of the Fair Debt Collection Practices Act. There is no authority that we're aware of that holds that service of discovery in a lawsuit constitutes a violation of the FDCPA. At best, under the Donahoe case from the Ninth Circuit, filing a complaint might constitute or could constitute a violation, but there is no authority that holds that serving discovery requests do in fact constitute a violation. But in the context of the case here, we have someone who's been sued who at the time that you're serving the discovery request on him is unrepresented. You've already gotten a note back from him that makes it very clear that this is not a particularly literate or well-educated person. You know that there's some form of brain damage, perhaps undetermined to you at this time. You ask for admissions that are very prejudicial to him if he admits. For example, he basically admits he loses. He has, under Montana law, 30 days in which to respond, and if he does not respond, they are deemed admitted. You don't tell him that. Why under the circumstances is that not deceptive? Well, in the first place, service of discovery is, by definition, permitted under the rules of civil procedure. That's not my question. Why is it not deceptive? Why under the circumstances present in this case is that not deceptive or abusive or trying to take advantage of someone you know is unrepresented and unsophisticated? Well, as a matter of fact, nothing untoward occurred. Mr. McCullough hired counsel, responded to the discovery, and denied the request that he needed to deny. The question is whether it was deceptive or not. I don't believe it was deceptive. Why not? Because Mr. McCullough knew what he needed to deny. He understood that he disagreed and took issue with the request. But at the bottom of those requests, as opposed to requests for admission in an ordinary lawsuit, there is a statement that this is an attempt to collect the debt. It's right on the request for admissions. Now, when I was in practice and sent out a request for admissions, we didn't have anything like that. This was clearly an attempt to collect the debt. Your client understood, I believe, that this request was something different, perhaps, and felt that disclosures had to be made, that this was a warning. So why doesn't that take it out of the usual rule that this is just another pleading that one files in a lawsuit? Well, I don't think it's a representation. I think we have to back up to determine whether it's a violation of the FDCPA. We have to determine, in the first place, are these requests actually representations about the status of a debt, or are they an unfair and abusive attempt to collect the debt? And they're merely a request for information from Mr. McCullough. It was a request for admission, not information. It was a request for admission, and the facts are deemed and admitted if he doesn't respond under 110 law. So it's not just a request for information? Well, Mr. McCullough was free to deny the requests, as he, in fact, did. Or not respond, in which they were deemed admitted, and he would have admitted false facts. But that didn't occur. Oh, but the question is whether or not the communication is deceptive in its concept. Well, I believe the requests did, in fact, state, while it didn't state the timeline, it stated if you do not deny these, they'll be deemed admitted. I mean, there was some information there, and Mr. McCullough obviously knew that he needed to take steps to respond. I think that, in that factual context, it can't be deemed a deceptive practice. I don't have your time a little bit, but are there any further questions from the panel? Not at this time. We'll give you some time for a couple. Thank you. May it please the Court. My name is Richard Rubin, and along with trial counsel John Heenan of Billings, we represent the plaintiff, Apolli Timothy McCullough. The defendant's numerous appeal points, in this case, can be seen in a couple different categories. The bulk of the appeal issues are claims that the trial court abused her discretion in admitting evidence into this case, and that is the majority of the claims. In this case, in every one of the situations which they claim that abuse of discretion, they make no attempt to explain how the trial court abused its discretion and instead are asking this court to reengage in the process of weighing discretion. It is remarkable that there is not a single attempt in their brief to say how the court applied the wrong legal standard, whatever they might have been able to do to say she abused her discretion. The remaining questions of law are all subject to dispositive points, binding precedent from this circuit, from the U.S. Supreme Court, that absolutely defeat their claims and for which they have no answer. One example of having no answer was the failure to answer your question, Judge Thomas, on the question of damages. You asked where was the legal error in the award of a quarter of a million dollars of emotional distress damages. They didn't answer it. You asked it twice, actually, and they have no answer for it. The suggestion as made today that there was no relationship or should be a relationship between specials or out-of-pocket damages and emotional distress is a self-fulfilling nullification of emotional distress damages. That's the point. The FDCPA, this court, the Supreme Court, the Federal Trade Commission, all recognize that emotional distress damages are available freestanding to compensate under the FDCPA for actual damages. The argument made on the other side is that $250,000 is a lot of money given the amount of distress documented on this record. So the argument, as I understood it, is not that emotional distress damages were not available in some quantity. The argument is that $250,000 is so obviously excessive given the actual distress shown that there should have been a remediator. How do you respond when the question is posed in that way? I mean, that is a secondary. The argument I was referring to was this one about relationship, which is nonsensical. But, yes, there is a claim that this is obviously too much money. So how do you explain it? Give us an explanation of the number, how the jury arrived at the figure of $250,000 for emotional distress. I can only, as far as how the jury arrived at the figure, as juries do every day in this country, one area of it which has not been mentioned at all is the demeanor of this plaintiff to stand there and say that he didn't suffer much damages without having seen him, with the evidence that we've seen in the paper record with the expert psychologist, his own testimony, a mentally disabled man who's been through this at least two times. There was some reference to a third case that wasn't clear. This is what juries do in this country. And frankly, Your Honor, $250,000 is not a very large amount of money in this day and age for emotional distress damages. How was it argued at trial that the jury, the emotional distress, not whether he suffered emotional distress, I think that's conceded, but the nexus between the emotional distress damages he testified to and the amount of damages awarded. If your answer is only as the juries do that, then I think we're at the end of our discussion. But did you argue, for example, that he's entitled to $250,000 because of X, Y, and Z pain and suffering? Most people, a lot of people argue in terms of special damages, the amount of prescription medicine. We didn't have that kind of evidence. As a matter of fact, although I don't believe that it was argued in the way that you're suggesting, Judge Thomas, counsel did suggest a number of $1 million in closing argument to the jury. It didn't seem to evoke, well, it wasn't awarded either, of course, by the jury. But I don't believe there was any attempt by trial counsel to... To do a per diem analysis, right? Exactly. And I think the best you have is that you presented the evidence and they were given a generic instruction that came with the figure. Is that where we are? Well, that, an instruction, by the way, that was not objected to, of course, in the law of this case that says very specifically what gave the jury the freedom to award this much money. But there was no specific evidence of particular harm or injury? Oh, yes. Oh, yes, I think there was. There was. Doctor, there was evidence of physical manifestations caused by these events, which is interesting because in the Ninth Circuit, some jurisdictions require physical manifestation for emotional distress damages. In this circuit, we do not require physical manifestations, but, in fact, it was presented anyway. The headaches... Excuse me, let me ask you. I don't want to throw you off, but how much of this is a question as to whether these were properly awarded under Montana law? Oh, absolutely. Well, it's an alternative basis, and that was also very important because the defendant in this case raised in their blue brief only one error, and that was that this was not allowed under this heightened... I'm sorry. I want to get you back on the track from which I deflected you on that is to say what is the evidence that supports the damage award? Right, but as far as... Yeah, we covered that, of course, in the brief. They have waived the alternative basis for federal damages, which really just makes that a moot point. But the evidence that was presented to the jury of physical manifestation, way beyond what this circuit requires, was the headaches that were caused and what Mr. McCullough described as his downtime. Apparently this was something that he's experienced, of course, with his preexisting condition. This was over and above the evidence that this court requires by way of evidence... So your opponent says the evidence showed that was what had him doing anyway before this ever occurred, that those were his symptoms already by virtue of his emotional distress situation before this occurred. Yes, and that was the argument they made to the jury, which rejected it. There was evidence. The defendant in this case is effectively asking this court to deny the jury its right. So you have his testimony, you have the testimony of Dr. Virali, and that's pretty much it. That's the damage testimony, yes. And in fact, this circuit doesn't require psychologists or other medical experts. This was so much farther beyond the minimal evidence that would support an emotional distress damage verdict in this circuit from other cases. The Romero case that we cited from California, another $85,000 emotional distress damage case under FDCPA, summarizes very clearly the circuit law on that, and this meets that standard and way beyond. I think the other thing that's important is that the defendant has come up, not only can they show no legal error, but on the damage issue, they can not show any case, not a single case, in which this amount of money was found to be somehow or other outside the realm in this kind of debt collection or consumer credit or any other kind of situation where a plaintiff has suffered emotional distress damage. Not a single case. The $250,000, yes, it's not a small amount of money, but in 2010 and 2009 when this case was decided, it is not excessive. This is precisely within the range and well below some other cases of emotional stress damages. I'm trying to get an issue about requests for admissions for a moment. The request for admissions is a red herring, Your Honor. Well, I'm not sure that it is. I mean, it is a serious issue raised in the sense that there's a line, there's a permissible line for lawyers once a suit is filed to be able to ask discovery. That's right, and that's not the point. The point is here, this is the essence of the Kimber Frymouth violation, and that is, it's not that they filed requests for admissions, which is shocking, of course, the way they did it. I don't believe there was any explanation, by the way, of the effect of not admitting. This was the evidence of aggressive, overly aggressive persistence in litigating the case. Whether it was requests for admissions or taking depositions or just simply filing motions for summary judgment, whatever it would be, that is what Kimber Frymouth and the legions of cases that they admit control of this issue under the FDCPA state. Once you know that a statute of limitations is run, you cannot persist in the litigation. It's just litigation. They are trying to say there's a litigation exception. So let's say, assuming for the sake of argument that they didn't know the statute of limitations had run, your response would logically be there's no problem with the request for admission. There's no problem with anything. Even though it had, in fact, the knowledge component. Absolutely. This is a judge-made rule, the Kimber violation. Most of the FDCPA, but not all, is strict liability without an intent or knowledge requirement. There are a few sections of the act. The Supreme Court in German this term mentioned the 1692 D6 violation requires knowledge or intent. There are a handful. And the Kimber court and its progeny have all established it has to be with some knowledge that the violation, that it was time barred. And then the defendant is simply trying to take advantage of unsophisticated consumers by getting them to waive a state affirmative defense. You would agree there's no case that we've seen that addresses requests for admission specifically, right? As a Kimber violation? Yes. Oh, no, there's none. There is, of course, the Fourth Circuit case in Said, which addresses discovery as another version of litigation abuse. But that's about the closest we have in terms of precedent. And nothing in our circuit. I think there's nothing. I don't believe there's anything in this circuit. I think the Fourth Circuit Said case is the closest on that point. But there is no distinction to be made under Donohue, under Heintz v. Jenkins, the Supreme Court decision. Under all of the legion of cases, there's no question anymore after Heintz that litigation activities are covered. It is litigation activities that are covered by the FDCPA, not whether they are done through discovery, whatever method of litigating a case a debt collector may employ. That's the point here. How do you respond to the argument that even though there is a separate pentative damages award of about, I think, $60,000, that the testimony during trial that the jury had in front of it at the time it awards $250,000 in emotional distress was such that we should suspect in reviewing that judgment that the jury included in that $250,000 a number that was intended to punish? There is no basis for that whatsoever. I think what's important, the jury knew from the special interrogator there still would be pentative damages. That was clear. But secondly, there was a statement made here that was, frankly, I've never heard anything like it. It said that under State Farm that the evidence of other activities of other people can only be used for reprehensibility. That's to nullify Rule 401 and 402. There's pattern and practice evidence. In this case, they argued that they were making a mistake. That's all. They kept on making a mistake. The sham credit card affidavit with attorney's fees was a mistake. Filing the lawsuit was a mistake. Continuing to prosecute after the client told them, dismiss the case, that we made a mistake. We made a mistake. There was no payment that revived the statute. It was all a mistake. That evidence was admissible to disprove mistake. That's what pattern and practice evidence does. In terms of just a mistake issue, what was the relevance of putting in all of the suits? I think it's Exhibit 106. That makes sense in terms of the punitive damage, but assuring that this firm has filed 2,700 lawsuits would not seem to be relevant to the absence of a mistake. Your Honor, what is remarkable is relevant in the sense that, for example, the expert witness testified without objection. No Daubert objection. No relevance objection that has been preserved. Testified that this was no mistake. This was the factory approach to the practice of law. Sorry, I was asking about the exhibit. The exhibit is part of the factory approach, I think. That's where I was going with that. Of course, they withdrew that objection as soon as it was admitted. That objection to the exhibit was withdrawn. I saw that. It's arguable whether he's withdrawing the general objection or just the... I think that part of the transcript is a better thing. That may be. There's one other thing I remember that's very important. They're arguing this remittiture issue. It hasn't been mentioned because it was actually the remittiture issue. It was apparently an afterthought in the Bloomberg field. It had one paragraph. But if this court were, under some theory, to remit the quarter of a million dollars in emotional stress damages, then the issue of treble damages under the state law, which the trial court, in its discretion, denied, would have to be resubmitted. Because the court ruled in denying the treble damages, when she exercised her discretion, she said the quarter of a million dollars was adequate compensation and that the treble damages had a compensatory component to it. I don't know, really, if the defendant, in this case, really wishes that result. But since the lower court, in exercising its treble damage discretion, ruled that it was not going to treble because the compensatory damages were adequate, if this court were to remit the actual damages, then necessarily the trial court should be given another opportunity to determine whether, indeed, whatever number that might be, is the kind of number that would either preclude trebling damages or provide an additional basis to either treble or some fraction of it. Your time has expired. Are there further questions from the panel? Thank you, counsel. And we'll give you two minutes for rebuttal. I think I'd like to start where Mr. Rubin left off with respect to if the court were to order a remitter, then the Consumer Protection Act ought to apply and the district court ought to be given a chance to treble the damages. Well, as we've raised in briefs, it's our position the Consumer Protection Act does not apply to this case. It does not apply to a law firm representing a client against an adverse party. There's no suggestion in either the text of the statute or the decisional law from Montana that it's supposed to have that kind of broad sweeping effect. The case law that the district court relied on from the Montana Supreme Court is the Baird versus Northwest Bank case. And that case simply said that the Consumer Protection Act applies to the original creditor that made the loan to the consumer. We're not even, we're nowhere near that situation. We're too removed from that. My client represented the debt buyer and it was adverse to Mr. McCullough the entire time. There was never any kind of consumer relationship between Mr. McCullough and anybody at my firm. We're effectively extending the Consumer Protection Act well beyond the statutory context. There's nothing in the statute that requires privity though, is there? Pardon me? There's nothing in the Montana statute that requires privity. There's nothing that requires privity, but I think it's implicit in the statute that it protects consumers. And it protects consumers who buy goods or services for family or household use. And it prohibits an abuse in trade or commerce. I think the only way to read that is, well people who sell or provide goods or services to the consumer are bound by the act. To put somebody who's been adverse from the consumer from the get-go in the position of having to comply with the act distorts the act beyond, I think, its reasonable interpretation. Getting back to the question of damages and whether the award was supported by the evidence or complied with the law, and I think with the plaintiff's briefing and the counsel's argument particularly telling on this point, because there isn't any evidence to support the award. The case law from this circuit, and it's Weyerhaeuser v. Accurate Recycling Corp., has three factors where an award should be reduced or vacated. Number one, where the award is grossly excessive or monstrous. Two, where the evidence clearly does not support the damage award. And three, where the award could have only been based on speculation or guesswork. That's exactly what we've got in this case. We particularly have speculation and guesswork because counsel couldn't explain how the jury got to the point where it did. And I think it's fair, in this context, to look at what is the remedy that Congress provided under the Fair Actual Action Practices Act that said you can get a statutory award that's capped at $1,000 and you can get your actual damages. To get back to my ratio or comparison between general damages and special damages, we can compare the $250,000 awarded by the jury in this case to the $1,000 that Congress said a party could collect under these circumstances. I think the comparison highlights the fundamental problem with the evidence that came in and the amount of the award. I see that my time is up. Thank you for the panel very much. Thank you, counsel. I want to thank you for your arguments. The case that's heard will be submitted. I want to thank all counsel today. It's very difficult to argue in these special sittings when you have a lot of people in attendance and I think everybody did a spectacular job and the briefing was excellent. We thank you all for high-quality presentations. I'd also like to thank Judge Siebel for the use of his courtroom and Judge Shanstrom for the use of the part-time owner of the courtroom and the use of the full-time owner. And for Judge Shanstrom for helping arrange this visit with Justice O'Connor, which has been wonderful. We have one other bit of business before we leave and that is a happy business that we're going to swear in some of my law clerks to the bar. So, do we get to that? Sure. I move for the admittance of Eric Gillespie in lieu of the State Court of California. All right. Will you stand, please? Raise your right hand. I solemnly swear I solemnly swear that I will support the Constitution of the United States that I will support the Constitution of the United States and the Constitution of the State of California and the Constitution of the State of California and that I will faithfully discharge that I will faithfully discharge the duties of an attorney the duties of an attorney and counselor at law and counselor at law to the best of my knowledge and ability to the best of my knowledge and ability. Congratulations. We're sorry they're not staying in Montana, but maybe we can lure them. And with that, we've concluded the business of the day. We thank you very much for your kind attention and presentations and we are adjourned.
judges: O'connor, Thomas, Fletcher W.